# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | Case No.: 1:15-cv-00218-REB |
| Plaintiff, | |
| vs. | **MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKTS. 34, 44 AND 46)** |
| UNITED STATES FOREST SERVICE, | |
| Defendant, | |
| CHALLIS CREEK CATTLE CO., LLC, *et al.*, | |
| Defendant-Intervenors. | |

This case involves a challenge to grazing activity on four allotments within the Salmon-Challis National Forest in central Idaho. Currently pending are three cross-motions for summary judgment (Dkts. 34, 44, and 46). One is filed by the Plaintiff, Western Watersheds Project ("WWP"), another by the Defendant, United States Forest Service ("the Forest Service"), and the third by the Intervenors, a group of grazing Permit holders who graze cattle on lands within the Salmon-Challis National Forest.[1] The issue before the Court is whether the Forest Service violated the National Forest Management

---

[1] The Defendant-Intervenors are: Challis Creek Cattle Co., LLC; Herb H. Whitworth; Walter H. and Debbie D. Johnson; James S. and Colleen Babcock; Churndasher Ranch; Scott McAffee; Logan E. Williams, Jr. and Tyrel L. Williams; Bart and Tina Wojciechowski; Dickey Livestock, Inc.; Mountain Springs Ranch, LLC; Shane D. Rosenkrance; Clinton Bitton and Ester Bitton Family Limited Partnership; No Tellum Creek Ranch, LLC; 6X Ranch, LLC; Terrance and Carol Donahue; and VerNon and Cecilia Joanne Roche.

**MEMORANDUM DECISION AND ORDER - 1**

Act when it re-authorized grazing on the allotments in 2015, by failing to consider whether continued grazing was impairing the recovery of riparian habitat adjacent to streams on the four allotments. WWP argues that the Forest Service failed to consider a set of riparian recovery standards adopted by the Forest Service in 1995 and incorporated into all Forest Plans. The Defendants and Intervenors raise a number of arguments as to why those standards do not apply to the particular watersheds at issue in this case. The Defendants and Intervenors also argue that the Forest Service's substantive decisions deserve deference under the Administrative Procedure Act. All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. The Court conducted a hearing, after which it ordered additional briefing. Being fully advised, the Court enters the following order.

## I. SUMMARY OF DECISION

Plaintiff WWP filed suit to challenge the Forest Service's policies regarding grazing practices and permits in the Antelope, Boone Creek, Copper Basin, and Wildhorse grazing allotments in the Salmon-Challis National Forest, seeking to stop grazing in the listed areas because of its negative impact to native fish habitat. To do this, it argues the Forest Service violated federal law by failing to comply with required stream habitat conservation strategies.

Various ranchers holding grazing permits on the allotments at issue intervened in the case. WWP, the Forest Service, and the Intervenors each moved for summary judgment. This decision resolves all three of those motions, denying WWP's motion and

granting the motions of the Forest Service and the Intervenors. Because deciding these motions resolves all the issues in the case, the case will be dismissed.

The precise legal claim in this lawsuit is whether the Forest Service violated the National Forest Management Act when it authorized livestock grazing without, as WWP contends, properly considering the impact to native fish habitat. WWP asserts that the grazing permits and their accompanying "Annual Operating Instructions" are inconsistent with the official Salmon-Challis National Forest Plan, including the INFISH aquatic conservation strategy incorporated into that Plan. The Forest Service and the Intervenors deny that the Forest Service has violated the law and disputes that there are any inconsistencies in the Forest Service's actions.

Because this lawsuit challenges the official actions of a federal agency carrying out its duties under the National Forest Management Act, the applicable legal standards are supplied by the federal Administrative Procedure Act. Therefore, WWP's burden is to prove that the Forest Service's actions violated the law or were otherwise improper. WWP failed to meet this burden.

However, the Court also decides that, contrary to the arguments of the Forest Service and the Intervenors, the INFISH strategy does apply to the grazing permits at issue, because by its terms INFISH applies to all National Forest lands within the Columbia River Basin – including the allotments at issue here. No exceptions or limitations apply to take these allotments out of the INFISH domain. But the Court agrees with the Forest Service and the ranchers that the grazing permits and associated

**MEMORANDUM DECISION AND ORDER - 3**

Annual Operating Instructions were lawful and proper. Despite WWP's evidence and argument that the nearby streams fail to meet target quality goals for riparian habitat, the Court must defer to the Forest Service's scientific judgments regarding stream quality. Regardless, the applicable laws do not require the Forest Service to cease or curtail grazing based just on poor stream quality; rather, there must be a demonstrated relationship between grazing and poor stream quality before the Forest Service becomes obligated to act. The evidence is not persuasive here that such a relationship exists.

WWP's remaining arguments likewise fail to prove that the Forest Service violated any law by issuing the grazing permits and the Annual Operating Instructions. Accordingly, summary judgment is granted in favor of the Forest Service and the Intervenors, and the case will be dismissed.

## II. BACKGROUND

The four grazing allotments within the Salmon-Challis National Forest are the Antelope Allotment, the Boone Creek Allotment, the Copper Basin Allotment, and the Wildhorse Allotment. The area in which these allotments are located is locally known as the Copper Basin. Numerous streams of various sizes run through these allotments. These streams are home to several species of fish, including whitefish, short-nosed sculpin, and paiute sculpin. (Defendant's Statement of Facts ("SOF") ¶ 4, Dkt. 46-2.) Though none of these species is federally listed under the Endangered Species Act, the fish populations in these streams are much lower than their historic levels, and their

numbers are also much lower than they were in the 1980s. (Plaintiff's SOF ¶¶ 4–5, Dkt. 34-3.)

Grazing in the general Copper Basin area has existed since the late 19th century, and it is conducted according to grazing permits granted by the Forest Service. These permits generally last for ten years, after which they may be reissued. (*See* Defendant's SOF at ¶ 6; s*ee also Oregon Natural Desert Ass'n. v. U.S. Forest Service,* 465 F.3d 977, 981 (9th Cir. 2006).) Though the permits last for up to ten years, the Forest Service sometimes makes year-to-year changes to the specific terms under which grazing will be allowed in a particular season. For example, the Forest Service might increase or decrease the number of cattle allowed on an allotment in response to drought conditions or overuse by cattle, or it might shorten or lengthen the allowable time for grazing, again depending on conditions. Each spring, prior to the beginning of the grazing season, the Forest Service issues a set of instructions called "Annual Operating Instructions" ("AOIs") detailing specific requirements that ranchers must follow for that particular season. (Defendant's SOF at ¶ 6.) The AOIs document the Forest Service's decisions on season-to-season changes in grazing in order to adjust to changing conditions on the allotments. *Id.*; *see also ONDA,* 465 F.3d at 981.[2] The AOIs prescribe the number of cattle that will be allowed in particular parcels of an allotment, the days on which cattle

---

[2] Examples of AOIs can be found in the record at AR 117, 137, 177, 250, 277, 309 (Antelope Allotment); AR 1136, 1140, 1169, 1197, 1217, 1294, 1346 (Boone Creek Allotment); AR 2086, 2090, 2122, 2130, 2205, 2297, 2322 (Copper Basin Allotment); and AR 5378, 5746, 5816 (Wildhorse Allotment).

**MEMORANDUM DECISION AND ORDER - 5**

will be allowed on those pastures and the dates they need to be moved, the number of riders that will be required to keep cattle from straying out of designated areas of use, as well as improvements (such as the fencing off of sensitive areas) that the Forest Service might require of ranchers to minimize the environmental impacts of grazing. (Defendant's SOF at ¶ 6.)  Throughout the grazing season, the Forest Service monitors the allotments for such things as forage use, fence maintenance, and whether the permit holders are following the required schedule of cattle rotation.  *Id.* ¶ 7.

Then, at the end of the grazing season, the Forest Service takes certain measurements, using stubble height and woody browse criteria, to determine whether the cattle have exceeded limitations (which are set in the permits) on how much vegetation can be consumed (or remain).  Specifically, the Copper Basin allotments require that grazing be managed so that grass stubble height at the end of season be at least four inches.  The "woody browse" criterion requires that cattle consume no more than fifty percent of the leaves on woody plant species on the allotments.  Measurements of the stubble height and woody browse criteria as well as assessments of whether the permittees have met these goals, are contained in "End of Season Reports," which are issued every fall, at the end of the grazing season.  (*Id.*; *see also* AR 237–49, 1320–38, 2292–96, 5823–25 (examples of End of Season Reports).)  Another focus of Forest Service monitoring efforts detailed in End of Season Reports is the "Greenline Ecological

Status" of certain riparian areas on the allotments.[3] (*See, e.g.*, AR 178, 10038, 11602, 11695, and 11261; *see also* Defendant's SOF at ¶ 36.) Because the Forest Service measures these things in order to assess the impact of grazing on an allotment, these indicators are discussed in detail throughout this decision.

## A.  The National Forest Management Act and the Multiple Use-Sustained Yield Act

In addition to the Administrative Procedure Act, which provides an overall framework for the Court's review of this case, the legal issues in this case also involve consideration of a number of other federal statutes and various rules and standards that have been promulgated in accordance with those statutes. Although a discussion of these various rules inevitably takes on a dry and technical quality, discussing them in some detail is crucial to understanding the legal issues before the Court.

The Court begins with the National Forest Management Act, most commonly known by the acronym "NFMA." 16 U.S.C. §§ 1600–1614. Enacted in 1976, NFMA provides the principal direction to the Forest Service in its management of all national forest lands. Distilled to its essence, NFMA requires the Forest Service to make forest

---

[3] "Greenline ecological status" describes the ecological condition of the plant community near a stream bank, and how close that community is to ecological maturity. (Defendant's SOF at ¶¶ 35–37.) The Forest Service uses three related descriptors, known as early, middle, and late seral status, to describe the ecological status of a given area. Late seral status describes a stage of plant life in a given area (be it the high desert or a forest) that is at least approaching its natural or undisturbed state. Early seral status, by contrast, would describe an area that has been heavily disturbed by fire, logging, grazing, or any natural or manmade disruptor.

management decisions by developing a document referred to as the "Forest Plan."  The

Forest Service has developed a Forest Plan for each National Forest, including the

Salmon-Challis National Forest.  NFMA also requires the Forest Service to consider the

"economic and environmental aspects of various systems of renewable resource

management."  16 U.S.C § 1604(g)(3)(A).  Another federal act, the Multiple-Use

Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528–53, requires that the Forest

Service manage forest lands so as to provide for a wide variety of possible uses of those

lands, including outdoor recreation, rangeland grazing, timber harvesting, watershed

protection, as well as fish and wildlife conservation and wilderness preservation.  16

U.S.C. § 1604(e)(1).  Once a Forest Plan is in place for a particular National Forest, each

proposed action the Forest Service either takes or allows on that particular forest must be

consistent with the Forest Plan.  16 U.S.C. § 1604(I); *see also Forest Guardians v. U.S.

Forest Serv.*, 329 F.3d 1089, 1092–93 (9th Cir. 2003).

Finally, when reviewing an agency decision, "a court may not substitute its own

construction of a statutory provision for a reasonable interpretation made by the

administrator of an agency."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467

U.S. 837, 844 (1984).  This well-established principle of administrative law, known as

"Chevron deference," has been interpreted to apply to statutes and regulations, as well as

"authoritative agency positions set forth in a variety of other formats." *Christensen v.

Harris County,* 529 U.S. 576, 590 (2000) (Scalia, J., concurring in part and concurring in

the judgment).  The *Christensen* majority declined to apply *Chevron* deference to an

agency's interpretation in an opinion letter, suggesting instead that such deference is warranted to interpretations "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* at 587 (majority opinion).

**B.      The Inland Native Fish Strategy – "INFISH"**

In addition to the National Forest Management Act, the Court must consider a set of rules and standards found in a conservation approach known as the Inland Native Fish Strategy. This strategy – known as "INFISH" – came on the heels of another conservation strategy known as PACFISH. (AR 11946.) INFISH was adopted in 1995 after notice-and-comment rule-making. Forest Service, Inland Fish Native Strategy, 60 Fed. Reg. 39,927 (March 14, 1995). Both INFISH and PACFISH are comprehensive documents containing numerous rules and standards; generally speaking, however, they contain possible methods to maximize quality fish habitat on Forest Service lands, and to minimize the impact on fish habitat of all manner of human activities that carry the potential to degrade fish habitat. PACFISH is focused on anadromous fish and INFISH is focused on freshwater species, but both strategies purport to deal with the degradation of riparian habitats and the decline in native fish populations resulting from decades of human activities, including grazing. For both, the overarching goal was to manage activities on forest lands so as to encourage restoration of fish habitat, or at least prevent further degradation.

Protecting bull trout habitat was a particular concern to the Forest Service when it adopted the INFISH conservation strategy; however, as discussed below, INFISH was

designed to protect all inland native fish species and the streams that contained them, not just those streams that did or could support bull trout.[4]  Finally, because INFISH was adopted as an amendment to all existing Forest Plans, it is thus part of all Forest Plans, including the plan that governs the Salmon-Challis National Forest.  (Defendant's SOF at ¶ 10; AR 11949.)  Actions taken by the Forest Service on the Salmon-Challis National Forest must therefore be consistent with INFISH, just as they must be consistent with the overall Forest Plan.

For this case, the most important part of INFISH is the general framework it created for analyzing whether riparian habitat is improving.  To measure improvement (or decline), INFISH established a set of "riparian management objectives" or "RMOs."  RMOs are criteria which, in 1995, were believed to provide reliable, objective measures of quality riparian habitat, and which are considered "measurable habitat parameters that define good fish habitat and serve as indicators against which attainment or progress toward attainment of the goals can be measured."  (AR 12033.)

The RMOs established goals for six habitat features, described below:

1.  *Pool frequency*: fish like to linger in pools and generally prefer a pool over swiftly moving water.

_____

[4] Bull trout is a large freshwater fish species, a member of the salmonid family native to Washington, Oregon, Idaho, Nevada, Montana, and western Canada.  *See* https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=E065 (accessed on October 9, 2017). Bull trout are a threatened species under the Endangered Species Act, and have a number of very specific habitat requirements, which include very cold water.  *Id.*

**MEMORANDUM DECISION AND ORDER - 10**

2. *Low bank angle*: the angle of the bank is significant because the angle of a stream bank affects erosion resistance and because an undercut bank provides cover for fish and the insects fish like to eat.

3. *Bank stability*: the stability of a bank also is a measure of erosion resistance. Further, for streams in grazing areas, the bank stability RMO provides a measure of whether the banks have been trampled (by cattle, by people, by machinery, or otherwise) or whether they remain intact.

4. *Large, woody debris*:  woody debris such as fallen logs or branches in a stream provide refuge for fish and insects (as do pools and undercut banks).

5. *Width-to-depth ratio*:  narrow deep channels generally provide better fish habitat than do shallow wide streams.

6. *Water temperature*: a water temperature of 8.9 degrees Celsius is optimal for bull trout spawning.[5]

In addition to setting goals for quality riparian habitat (the RMOs), INFISH also contains an extensive set of standards and guidelines for the Forest Service's management of the various activities that take place on forest land, such as logging, mining, road-building, recreation, in addition to grazing.  INFISH provides standards for managing each of these activities, including four standards applicable specifically to the

---

[5]  The RMOs appear on p. 12101 of the Administrative Record.  The description of the reasons for the RMOs in the text above reflects the Court's general understanding of their significance and is provided to aid the reader in understanding the issues in this case.

management of grazing.  For this case, the Court is concerned only with the first standard, named GM-1.[6]  GM-1 requires the Forest Services to "[m]odify grazing practices (e.g., accessability of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent attainment of [RMOs] or are likely to adversely affect inland native fish."  (AR 11974.)  GM-1 requires the Forest Service to "[s]uspend grazing if adjusting practices is not effective in meeting Riparian Management Objectives."  INFISH further defines the phrase "retard attainment of an RMO" as "to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system."  (AR 11968.)  The Forest Service's methodology for assessing whether grazing was "retarding" attainment of the RMOs (which it began to develop immediately after the adoption of INFISH) focuses on measuring and tracking three factors: 1) the greenline successional status of riparian habitat; 2) woody species regeneration near streams; and 3) the bank stability RMO.  (AR 11924–11930; AR 12186–12225; AR 12281–12443.)  This methodology will be discussed in detail later in this opinion.

Even though the standards of GM-1 and the RMOs are seemingly clear in isolation, several factors muddy the waters, so to speak, when the RMOs are assessed in application to the facts at hand.  There is, to begin with, a vast diversity of ecosystems in the West and not all streams are identically created.  Some streams are small and some are

[6] The "GM" designation stands for "grazing management."

large. Some are deep and well-shaded, with pools and sharply undercut banks where fat trout like to hide. Some are shallow channels that flow through high sagebrush country characterized by climactic extremes. Because of this diversity, INFISH recognized that not every stream could meet each and every RMO, even if all human activities in or near the stream were completely curtailed. This unrealized (or unrealizable) ambition is explicitly recognized in INFISH, which describes that some RMOs "may not occur in a specific segment of stream within a watershed, but all generally should occur at the watershed scale for stream systems of moderate to large size." (AR 12100.) Further, INFISH recognizes that "the components of good habitat can vary across specific geographic areas." *Id.*

Because the measures of habitat naturally vary from stream to stream, INFISH did not prescribe that the RMOs were absolute standards (either floors or ceilings) that *all* streams had to meet. Rather, they were intended as benchmarks against which progress could be measured until more site-specific targets were identified:

> Interim RMOs for stream channel conditions provide the criteria against which attainment or progress toward attainment of the riparian goals is measured. Interim RMOs provide the target toward which managers aim as they conduct resource management activities across the landscape. It is not expected that the objectives would be met instantaneously, but rather would be achieved over time. However, the intent of interim RMOs is not to establish a ceiling for what constitutes good habitat conditions. Actions that reduce habitat quality, whether existing conditions are better or worse than objective values, would be inconsistent with the purpose of this interim direction. Without the benchmark provided by measurable RMOs, habitat suffers a continual erosion.

*Id.*

**MEMORANDUM DECISION AND ORDER - 13**

The INFISH RMOs also were not intended to become a permanent template. Rather, INFISH was designed as an interim strategy to last only for eighteen months. During that time period, the Forest Service intended to develop more finely-tailored objectives for specific watersheds in the Columbia River Basin. (Defendant's SOF p. 11.) Indeed, INFISH anticipated that at some point the RMOs would be "refined to better reflect the conditions that are attainable in a specific watershed or stream reach based on local geology, topography, climate and potential vegetation." (AR 12100.)

Hence, the interim guidelines of INFISH (i.e., the RMOs) were adopted to prevent the further degradation of fish habitat while the Forest Service was pursuing the refinement of such objectives to reflect the conditions of specific watersheds and specific streams. However, for whatever reasons, that refinement project was never completed. Instead, INFISH was administratively extended in the late 1990s, and its standards, including the RMOs, thus continue to apply – even though originally not intended to apply on a long term basis across every stream reach within all forest lands subject to INFISH strategy and even though it was recognized at the time that a one-size-fits-all strategy was not appropriate. *See Friends of the Wild Swan, Inc. v. U.S. Forest Serv.,* 966 F.Supp. 1002, 1010 (D. Or. 1997) (recognizing administrative extension of INFISH); *see also* AR 43014, 43218.

Finally, the Forest Service participates in a monitoring program, known as the "Pacfish/Infish Biological Opinion Effectiveness Monitoring Program" (the "PIBO Program"), that tracks both end of season use indicators (i.e., the stubble height and

woody browse criteria) and RMO data throughout the upper Columbia River Basin,

including in the Salmon-Challis National Forest.  (Plaintiff's SOF at ¶ 17; Defendant's

SOF at ¶¶ 29–33; AR 14237.)  One purpose is to evaluate whether stream and riparian

conditions are being maintained and improved.  Another purpose is analyze the cause and

effect of management strategies, which includes looking for "direct links with grazing."

(AR 14240.)  The PIBO team monitors sites on a rotating basis such that sites are

monitored approximately once every five years.  (Plaintiff's SOF at ¶ 17.)

## III.   LEGAL STANDARDS

The Court's review of the Forest Service's grazing management decisions pursuant

to the NFMA is governed by the Administrative Procedure Act ("APA").  *See* 5 U.S.C.

§§ 701–706.  The APA provides, in relevant part, that a reviewing court "shall ... hold

unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A).  The arbitrary and capricious standard is deferential and an agency action will

be reversed as arbitrary and capricious "only if the agency relied on factors Congress did

not intend it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise."  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir.2009) (quotations and

citations omitted).  Nevertheless, the court must review the administrative action to

ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory

**MEMORANDUM DECISION AND ORDER - 15**

explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) *(*quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 285 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).  In APA cases, the court reviews the administrative record, and may not engage independent fact-finding.  *See, e.g.*, *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985).  An agency's decision can be upheld only on the basis of the reasoning found in that decision.  *Anaheim Mem'l Hosp. v. Shalala,* 130 F.3d 845, 849 (9th Cir. 1997).

## IV.  ANALYSIS

The Forest Service raises several threshold legal questions relating to whether the standards of INFISH apply to the grazing allotments in question.  The Court addresses these arguments before turning to the question of whether the agency's substantive decision to continue grazing in 2015 on similar terms as in years prior is entitled to deference under the APA.

### A.  Whether INFISH Applies to the Copper Basin, and to the Allotments at Issue.

First the Court must decide whether INFISH was even intended to apply to the particular streams and the particular grazing permits at issue in this case.  The Forest Service and the Intervenors have advanced overlapping but not entirely identical

**MEMORANDUM DECISION AND ORDER - 16**

arguments, each asserting in subtly different ways that INFISH does not apply either to the watersheds or the grazing permits at issue. The Forest Service's argument depends upon the fact that grazing on the four Copper Basin allotments began in the early part of the twentieth century, decades before INFISH was adopted. The Forest Service argues that INFISH was never meant to apply to activities such as grazing that predate the very existence of INFISH, unless those activities occur on certain types of watersheds (known as "priority watersheds") containing high quality bull trout habitat. Essentially, the Forest Service takes the position that on non "priority watersheds" such as those in the Copper Basin, grazing activities that predate the adoption of INFISH are "grandfathered in," so that INFISH only would apply if the current permittees allowed their permits to expire, and then grazing permits were subsequently issued to a different person or entity after a lapse of time.

The Intervenors' argument is more broad. The Forest Service's argument acknowledges the possibility that INFISH might apply to the allotments at some future date; however, the Intervenors contend that INFISH does not apply – ever – to "nonpriority" watersheds. Both arguments are completely at odds with the language of INFISH itself.

**1.    INFISH Applies to *All* National Forest Lands Within the Columbia River Basin.**

To sort these issues out, the Court turns to the structure and text of INFISH itself. INFISH has dual objectives, in that it contains two conceptually separate "tracks" for

protecting riparian habitat. The INFISH strategy segregated Forest Service lands within the Columbia Basin into two types of watersheds. The first type consisted of the previously referenced "priority watersheds" – i.e., watersheds most in need of immediate protection either because they contained critical bull trout habitat or had a high potential for successful restoration. On priority watersheds, the standards and guidelines of INFISH applied immediately, and required that even existing (i.e., "ongoing") projects be screened right away in order to determine what risks they posed to the health of native inland fish. The second type of watershed consists, quite simply, of every other watershed on National Forest land within the Columbia Basin that was not a "priority watershed." In contrast, only new projects or activities on non-priority watersheds would be affected by INFISH's requirements.

The language of INFISH makes a clear differentiation between priority watersheds and non-priority watersheds. First, the section titled "THE DECISION"states:

> This decision amends Regional Guides for the Forest Service's Northern, Intermountain, and Pacific Northwest Regions, and 22 Forest Plans in the affected National Forests. The Forest Service will apply management measures to ***all proposed or new projects and activities*** involving the management of timber, roads, grazing, recreation resources, riparian areas, minerals, fire and fuels, and land uses such as leases, permits, rights-of-way and easements, as well as restoration of watershed, fish, and wildlife habitat on National Forest System lands occurring in eastern Washington and Oregon, Idaho, western Montana, and a small portion of Nevada (except for those areas under the direction contained in the Northern Spotted Owl Record of Decision and PACFISH). ***These measures essentially provide for mitigation of environmental effects of future decisions. Proposed or new projects and activities are defined as those actions that have not been implemented, or for which contracts have not been awarded, or for which permits have not been issued.*** This management direction also applies to

ongoing projects and activities within the priority watersheds that might pose an unacceptable risk to inland native fish. Ongoing projects and activities are defined as those actions that have been implemented, or that have contracts awarded, or permits issued.

(AR 11950 (emphases added).)

INFISH also explains that the Forest Service considered several alternative methods for protecting native inland fish before it adopted the conservation strategy in its final form. (AR 11950–11955.)  One of these, Alternative B, would have focused on providing strong protections for streams with bull trout habitat on about nine million acres (about 36 percent)of Forest Service lands within the Columbia Basin, but would *not* have addressed the remaining forest lands containing streams with other sensitive species.[7]  Ultimately, the Forest Service rejected this option, explaining that although Alternative B would have provided "greater management flexibility," it also created "unacceptable risks to inland native fish species other than bull trout."  (AR 11953.) Ultimately, the Forest Service elected a different alternative, Alternative D, the essence of which has been described at length above.   The text of INFISH specifically states that the Forest Service selected Alternative D because it "would provide a higher level of risk reduction, based on a strong set of guidelines and standards ***that would be uniform across all 24.9 million acres addressed by Inland Native Fish Strategy*.**" (AR 11954 (emphasis added).)  This language puts to rest the Intervenor's Argument that INFISH does not

_____

[7] The distinction between streams that could support bull trout habitat, and those that cannot, closely tracks the priority watershed/non-priority watershed distinction.

**MEMORANDUM DECISION AND ORDER - 19**

apply, at all, except on priority watersheds. The distinction between priority and non-priority watersheds affected only the timing of the INFISH rollout on forest lands. The clear intent of the Forest Service in adopting Alternative D was to provide uniform protection for native inland fish across all affected forest lands.

**2.    INFISH Applies to the Intervenors' Grazing Permits**.

Next, the Court considers the Forest Service argument that INFISH does not apply to the specific grazing permits implicated here because the grazing activities on these allotments predate the adoption of INFISH. The parties agree that grazing on each of the four allotments has existed for decades, in some cases dating back to the late nineteenth century. Western Watersheds and the Forest Service also agree that on non-priority watersheds such as the watersheds within the Copper Basin, INFISH only applies only to *new* activities, and *not* to activities that were "ongoing" at the time INFISH was adopted in 1995. They depart, however, as to whether grazing on the four allotments is properly characterized as "new" or "ongoing." The Forest Service focuses on the fact of the decades-long grazing allowed on these allotments, since long before INFISH. Western Watersheds focuses on the fact that although grazing is a decades-old activity in the Copper Basin, the specific permits permitting grazing have all expired at some point and been reissued at least once since 1995. For the reasons discussed below, the Court agrees with Western Watersheds as to the nuance of this particular issue, and that the long-standing nature of grazing activity generally does not bar the application of INFISH.

Federal grazing permits do not grant permit holders perpetual rights to graze. Rather, they are in the nature of a revocable license, which is granted pursuant to a permit, which the federal government may cancel or modify at any time for any reason and without payment of compensation.  43 U.S.C. § 1752(a); *see also United States v. Fuller,* 409 U.S. 488 (1973).  Federal law specifically provides that a permit to graze livestock on public lands "shall not create any right, title, interest, or estate in or to the lands."  43 U.S.C. § 315b.  Grazing permits are issued for a maximum term of ten years, after which they may be renewed.  36 C.F.R. § 222.3(c)(1).  The notion advanced here by the Forest Service that pre-existing grazing activities are "grandfathered in," against the requirements of INFISH, does not comport with these well-established principles.[8]

Western Watersheds argues that under the INFISH scheme, grazing became a "new" project or activity when a term grazing permit was reissued for a particular grazing allotment, and the Court agrees.  This very issue was addressed in the Environmental Assessment or ("EA") which accompanied INFISH itself.  A section of the EA titled "Effects on Range" addresses the anticipated affect of INFISH on grazing activities on federal lands.  After first describing the immediate effects that INFISH would have on grazing within priority watersheds, the EA states:

---

[8]  The Forest Service's focus on whether grazing activities generally predated INFISH as the ultimate measure of whether INFISH's rules would apply is somewhat perplexing, given INFISH's clear directive that it was to apply *immediately* on priority watersheds, even for projects that were "ongoing" and not new.  If there were some perceived need to "grandfather in" existing activities, then surely the Forest Service would not have felt constrained from applying INFISH's standards right away on existing projects on the most critical stream reaches.

For future operations, all action alternatives would require a more intense review of the interaction between grazing activities and riparian and aquatic habitats. As discussed in the non-forested vegetation section, ***this could require modifications of grazing practices or range improvements. Within the interim period, this would primarily affect range allotment permits that must be reissued.*** For priority watersheds, the results of the screening process can be combined with other analyses prepared for the NEPA and the biological evaluation to make a determination on reissuance. For non-priority watersheds, additional screening could be necessary to combine with other analyses prepared for the NEPA and the biological evaluation to make a determination on re-issuance.

(AR at 12066 (emphasis added).) In other words, when it issued INFISH, the Forest Service plainly contemplated that its standards would begin to apply when grazing permits were reissued, and that the application of INFISH standards might require "a more intense review" of the effect of grazing on riparian health. In 2003, the Forest Service also modified the grazing permits at issue to incorporate "current Challis Forest Plan standards and guidelines." This included an explicit adoption of INFISH standards, including GM-1. *See, e.g.*, AR 2453, 2461, 2469, 2494, 2510, 757, 758, 759, 761, and 763. *See also* Defendant's SOF at ¶ 26.[9]

Although an agency's interpretation of its own rules and regulations is ordinarily entitled to deference, positions that are "plainly erroneous or inconsistent with the regulation" are not. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Here, the position the Forest Service articulated at oral argument was essentially that

---

[9] As the Court explains in section B, below, the fact that the Forest Service anticipated that additional screening and/or modification of grazing decisions might occur in the context of a NEPA analysis that would be necessary on re-issuance of a grazing permit does not mean that those decisions could *only* occur in that context.

INFISH would *never* apply on non-priority watersheds to grazing activities that pre-date

the adoption of INFISH, except in very limited situations where a permit holder either

abandoned the permit or allowed it to lapse, and then some time later, a new individual

sought to graze cattle on the same allotment.  This position, however, is not only

inconsistent with the plain text of INFISH itself, it is also inconsistent with the Forest

Service's own explicit adoption of the INFISH standards into term grazing permits that

were reissued after 1995.  In short, the Forest Service's assertion that INFISH could never

apply to pre-existing grazing activities is nothing more than a litigating position and as

such, it not entitled to deference.  *Price v. Stevedoring Servs. of Am., Inc.,* 697 F.3d 820,

830 (9th Cir. 2012); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212 (1988).

**B.**  **Neither the Rescissions Act Nor the Appropriations Riders Require That Grazing Be Recognized as an "Ongoing Activity."**

Next, the Court addresses the interrelationship between INFISH, the National

Environmental Policy Act ("NEPA"), the Rescissions Act, and certain Appropriations

Riders, and the impact these various statutes have on the questions at issue in this case.

*See* PL 104-19 § 504, 109 Stat 194, 212–213 (July 22, 1995) (Rescissions Act), and PL

108-108, 117 Stat. 1241 (Appropriations Riders of 2004).  The Forest Service relies on

certain provisions in these laws to bolster its argument that grazing must be considered an

"ongoing activity" to which INFISH cannot apply, at least not at the present time.  For the

reasons that follow, the Court disagrees.

The Rescissions Act of 1995 directed the Forest Service to prepare a schedule for

completing NEPA analyses for all grazing allotments within the National Forest System.

At the same time, Congress – apparently anticipating that setting a schedule might prove

to be a much more manageable task than completing the work required to stick to it –

included a provision providing that no grazing permits would be terminated simply

because the Forest Service had not conducted a NEPA environmental analysis before any

scheduled deadline for doing so. Though Congress's primary concern appeared to be the

possibility of the Forest Service's inability to complete NEPA analyses in a timely

fashion, the Rescissions Act by its terms also applies to other tasks the Forest Service

must undertake in accordance with any other environmental law. In relevant part, the

Rescissions Act provides:

> (b) REISSUANCE PENDING NEPA COMPLIANCE.--Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service System units shall be issued on the same terms and conditions and for the full term of the expired or waived permit. Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis.

> (c) EXPIRED PERMITS.--*This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed* and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

PL 104-19 § 504, 109 Stat 194, 212–213 (July 22, 1995) (emphasis added).

The Rescissions Act of 1995 was followed by several Appropriations Acts

containing Congressional references to the Rescissions Act, making clear Congress'

intent "that no grazing permit should be invalidated because the Forest Service has not completed the allotment analysis prior to the date listed in a 1996 Forest Service schedule adopted by the agency pursuant to Section 504 of the Rescissions Act." H.R. CONF. REP. NO. 108-76, at 97–98 (2003). Specifically, Section 325 of the 2004 Appropriations Act for the Department of the Interior states:

> where National Forest System lands are involved and the Secretary of Agriculture has renewed an expired or waived grazing permit prior to fiscal year 2004, the terms and conditions of the renewed grazing permit shall remain in effect until such time as the Secretary of Agriculture completes processing of the renewed permit in compliance with all applicable laws and regulations or until the expiration of the renewed permit, whichever comes first. Upon completion of the processing, the permit may be canceled, suspended, or modified, in whole or in part, to meet the requirements of applicable laws and regulations . . .

*Id.*

The highlighted portions of the Rescissions Act and Appropriations Riders have been held to provide "a limited grace period of validity for grazing permits that expire and must be renewed prior to the relevant environmental (NEPA or ESA) analysis being completed." *Western Watersheds Project v. Bureau of Land Mgmt.,* 629 F.Supp.2d 951, 969 (D. Az. 2009). While the Rescissions Act applies to decisions that the Forest Service must make under *any* environmental law, and not just NEPA, the duty to conduct an analysis under NEPA is separate from and independent of the duties created by other environmental laws, such as NFMA and Forest Plans promulgated under it. Thus, the fact that the Forest Service has not completed a NEPA analysis (or some other analysis required of the agency) for whatever reason (a lack of time, or a lack of resources, as

**MEMORANDUM DECISION AND ORDER - 25**

examples), does not insulate review of decisions the Forest Service made (or was required to make) under completely separate laws. This would include the Forest Service's decision in the 2015 Annual Operating Instructions to re-authorize grazing on the same or very similar terms as in prior years. Further, the highlighted language above also plainly applies only in the context of permits that have expired, and are subject to possible re-issuance, depending on the outcome of relevant environmental analysis.[10] Neither the Intervenors nor the Forest Service have argued that the Copper Basin permittees are in this situation.

Nor does the 2004 Appropriations Rider have the effect that the Forest Service and Intervenors assert. Though the Rider is plainly applicable in any situation where the Forest Service has not had time to complete a required environmental analysis (not just those required under NEPA), like the Rescissions Act, the 2004 Appropriations Act language is still in the nature of a grace period which allows grazing activities to continue if the only reason for stopping them is that the Forest Service has not had time to analyze whether they are in accordance with applicable environmental laws. Crucially, this case does not involve a situation where the Forest Service asserts that it has not had time to conduct a required environmental analysis. This case involves a *completed* decision – the issuance of the 2015 AOIs – that constitutes final agency action. *See, e.g.*, *Oregon Nat.*

---

[10] For this reason, section 402 of the Federal Land Policy and Management Act ("FLPMA") also does not change the outcome in this case. By its very terms, that section is only applicable in the context of grazing permits that have expired. It thus has no applicability to year-to-year decisions that are made in AOIs, pursuant to *existing* term grazing permits.

*Desert Ass'n v. U.S. Forest Serv.,* 465 F.3d 977, 983 (9th Cir. 2006). It makes perfect

sense to allow grazing to continue in situations where the Forest Service has not had time

to act. It is quite another thing, however, to hold that a *completed* decision is exempt

from ordinary review under the APA (which in this case involves consideration of

whether the 2015 AOIs were consistent with the Forest Plan and INFISH) simply because

the Forest Service has not had time to undertake an analysis that may be required under

an entirely separate set of environmental laws. "Section 325 does not constitute a broad

exemption from all environmental laws that might *on their own* require modification of

grazing permits." *Western Watersheds Project v. BLM,* 629 F.Supp. 2d at 970. For all

these reasons, neither the Rescissions Act nor the Appropriations Riders have any bearing

on the primary question presented in this case – the question of whether the Forest

Service's 2015 AOIs were consistent with the Forest Plan, including INFISH.

**C.      The Forest Service's Reauthorization of Grazing in the 2015 Annual
         Operating Instructions ("AOIs").**

Having decided that INFISH applies, the Court must next decide whether the

Forest Service acted in an arbitrary and capricious manner when it issued the 2015 AOIs

re-authorizing grazing on substantially similar terms as in the previous year.

The parties have completely different views of the environmental health of the

Copper Basin allotments, and in particular the status of riparian areas on those allotments.

For their part, the Forest Service and Intervenors assert that streams on the four Copper

Basin Allotments are all in relatively good shape. They contend that most of the streams

meet the bank stability RMO, and that the plant life near the greenline is in late seral status in most locations. (Defendant's SOF at ¶ 36.) Western Watersheds, on the other hand, says that evidence shows that certain RMOs (primarily those dealing with water temperature, lower bank angle and stream width-to-depth ratio) are generally *not* met on the allotment streams. WWP also asserts that the condition of the allotments has degraded in recent years, though, as will be explained in more detail below, the evidence that WWP points to in support of this contention is not especially convincing.

The Court must sort these issues out within the framework of the Administrative Procedure Act, which requires the Court to defer to scientific judgments of an agency, but also requires reversal if it can be shown that the agency failed to consider an important aspect of a problem. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009). Keeping these principles in mind, the Court concludes that the Forest Service was acting in accordance with all applicable legal standards, including INFISH and GM-1, at the time it issued the 2015 AOIs. The Court's reasoning on this issue focuses upon several critical points. One, RMOs were never intended to be absolute measures of stream health, but rather, benchmarks against which progress or the lack of progress could be measured. Two, GM-1 does not require that grazing cease or be curtailed solely because RMOs are not met, but instead requires that the Forest Service assess whether grazing is *causing* (or at least contributing to) the non attainment of the RMOs. Three, the Forest Service's methodology for assessing whether grazing is a cause of non-attainment is a matter of scientific judgment entitled to deference from this Court. Fourth and finally, the

evidence that Western Watersheds cites to support its claim that the streams on the

Copper Basin allotments were degrading is not sufficient to convince the Court that the

agency acted arbitrarily and capriciously or ignored an important aspect of the problem.

1.      **The Court Will Consider Certain Portions of the Affidavits of Forest Service Employees.**

Before discussing in detail the Forest Service's decision to allow grazing in 2015

on the same or similar terms as the year before, the Court revisits its previous decision to

strike the bulk of affidavits submitted by Forest Service employees Diane Weaver, Bart

Gamett, and Eric Archer.  The Court previously struck most of the content of these

affidavits because the Court's initial view was that the assertions made in the affidavits

were primarily post hoc rationalizations made to retroactively justify the Forest Service's

actions taken in the 2015 RMOs.  (Dkt. 81.)  However, the many hours the Court has

spent with the administrative record since issuing that decision have convinced the Court

that this prior assessment was mistaken.  With the benefit of a fuller understanding of the

record and, specifically, the manner in which the standards of INFISH and GM-1 have

been implemented over time, the Court is satisfied that the information in such affidavits

is not post-hoc rationalization.  Rather, such information properly informs the Court of

the Forest Service's reliance on the quality of riparian vegetation, greenline ecological

status, and bank stability to measure the effect of grazing on stream health, a science-

based approach that has a long pedigree going back to the very adoption of INFISH and

PACFISH.  The previously stricken portions of the affidavits explain and condense

**MEMORANDUM DECISION AND ORDER - 29**

information that is otherwise contained in a hodgepodge of different locations within a nearly fifty-thousand page administrative record.

Turning then to the record, the Forest was instructing its employees as early as May of 1995 about the role that monitoring of riparian vegetation would play in measuring whether grazing was retarding attainment of the RMOs under both INFISH and PACFISH. (AR 11905.) Forest Service guidelines issued just after the adoption of PACFISH included an "enclosure" document emphasizing that most of the adverse impacts of grazing on riparian habitat could be avoided by monitoring the condition of streamside vegetation. This enclosure also identified greenline ecological status, woody species regeneration, and bank stability as the factors that should be monitored to measure the effect of grazing on allotments subject to PACFISH. (AR 001926–30.)

In October of 1995, the Forest Service issued an Implementation and Monitoring Plan specifically for INFISH that adopted the approach of PACFISH for monitoring the effects of grazing on attainment or non-attainment of RMOs. (AR 42827.) This document provides, in language similar to that found in PACFISH documents, that "[s]ince the condition of the riparian vegetative community directly affects these RMOs and changes in riparian vegetation are generally detectable within short time periods, *the recovery of the vegetation component of the riparian system will be used to predict whether grazing will ultimately degrade, retard, or prevent, the attainment of the RMOs.*" (AR 42827 (emphasis added).)

Significantly, the Forest Service has continued to emphasize the role of riparian vegetation in assessing the impact of grazing on RMO attainment in more recent years as well, including most critically in a 2008 guidance document entitled "A Strategy for Managing Livestock Grazing Within Stream Riparian Communities on the Salmon-Challis National Forest." (AR 12189, 12191–92.) Finally, a detailed review of the Administrative Record confirms that the approach generally described in the Forest Service Affidavits is indeed the approach that it has taken all along. Specifically, the End of Season reports show that the Forest Service routinely monitors the condition of woody species usage along the greenline. (*See, e.g.*, AR 177, 227, 246 (Antelope Allotment); 1221, 1271, 1320, (Boone Creek Allotment); 2135, 2198, 2292 (Copper Basin Allotment); 5743, 5751, 5783 (Wildhorse Allotment).) The Forest Service also tracks the greenline ecological status of streamside vegetation at various monitoring sites throughout the allotments. (*See* Defendant's SOF at ¶ 36; AR 24923, 732, 1802, 1809, 1816, 6526, 6527, 6523, and 6533.) The Forest Service monitors the bank stability RMO through the PIBO monitoring program. (Defendant's SOF at ¶ 31.) For all of these reasons, the Court concludes that the affidavits of Ms. Weaver, Mr. Gammet, and Mr. Archer are admissible because they are helpful and necessary to explain a complex scientific subject. *See Tri-Valley CAREs v. U.S. Dept. of Energy,* 671 F.3d 1113, 1130 (9th Cir. 2012). As a separate basis for admissibility, these affidavits can be viewed as properly seeking to illuminate reasoning "obscured but implicit in the administrative record." *See, e.g., Consumer Fed'n of Am. v. U.S. Dept. Of Health & Human Servs.,* 83

F.3d 1497, 1507 (D.C. Cir.1996).  Accordingly, the Court reverses its decision on the

motion to strike, and denies the same.

> **2.**     **Principles of Administrative Law Require the Court to Defer to the Forest Service's Scientific Decisions about How to Assess Causation Issues in Accordance with GM-1**.

The question of whether the reauthorization of grazing in the 2015 AOIs was

consistent with INFISH turns largely on whether such reauthorization was consistent with

GM-1.  Hence, the requirements of the GM-1 standard are worth repeating here.  GM-1

requires the Forest Services to "[m]odify grazing practices (e.g., accessability of riparian

areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that

retard or prevent attainment of Riparian Management Objectives or are likely to adversely

affect inland native fish."  (AR 11968.)  GM-1 also requires the Forest Service to

"[s]uspend grazing if adjusting practices is not effective in meeting Riparian Management

Objectives."  Here, there is importance to INFISH's definition of the phrase "retard

attainment of an RMO" as meaning "to slow the rate of recovery below the near natural

rate of recovery if no additional human caused disturbance was placed on the system."

(AR at 11968.)  Implicit within this language is a requirement that the Forest Service

consider the question of causation.  In other words, GM-1 does not empower the Forest

Service to curtail or halt grazing simply because the streams on a particular allotment may

not meet the RMOs, because not all streams could meet all RMOs even in the absence of

grazing or any other anthropogenic activity.

Further, as is abundantly clear in INFISH, the RMOs are not absolute measures of quality habitat, but rather serve as benchmarks against which progress (or the lack of progress) toward such benchmarks may be measured. Accordingly, the Forest Service must focus not on whether, in absolute terms, a particular stream fails to meet the RMOs, but rather on *why* the stream does not meet them. More specifically, GM-1 requires the Forest Service to consider whether grazing is the cause of the non-attainment.

One core argument raised by Western Watersheds is that the Forest Service ignored GM-1 when it issued the 2015 AOIs, but the record actually reveals that the methodology (measuring greenline status, bank stability, and the condition of riparian vegetation) was actually how the Forest Service implemented the concerns of GM-1 – that is, by coming up with a set of standards that could measure the effect of grazing on riparian habitat. In that context, the Forest Service's methodology for determining causation is a matter of scientific judgment that is entitled to deference. *See Castaneda*, 574 F.3d at 658–659 ("We grant considerable discretion to agencies on matters requiring a high level of technical expertise." (quotation marks and citation omitted)). Further, nothing in the record suggests that the Forest Service had reason to question whether its methodology for assessing the effect of grazing was inadequate when the grazing AOIs were issued in the spring of 2015.[11]

---

[11] WWP describes the Forest Service's use of bank stability, greenline ecological status, and annual measurements of vegetation usage as an improper "proxy approach" because it fails to ensure "that the proxy results mirror reality." (Reply Brief, Dkt. 49; *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th

### 3.    The Court's Review of Plaintiff's Evidence.

Leaving aside for the moment the findings of the PIBO study, which were not in existence at the time the Forest Service issued the 2015 AOIs, Western Watersheds relies on four general types of evidence for its argument as to why the 2015 AOI decisions were arbitrary and capricious.   It is necessary for the Court to review this evidence in some detail, not in order to make independent findings of fact, but in order to determine whether the Forest Service "entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Castaneda*, 574 F.3d at 656.   Having made a close examination of the record, the Court is satisfied that the picture of wholesale habitat degradation painted by Western Watersheds simply does not square with the evidence. The agency's decision to reauthorize grazing in the 2015 AOIs is based on a reasonable view of the pertinent evidence, to which this Court must defer even in the face of some legitimate criticism and alarm over specific areas of concern within the allotments.

---

Cir. 2004).  The argument is misplaced.  When a federal agency uses habitat as a proxy for the viability of a particular endangered animal, evidence that the animal has not been seen in the proposed project area is a good indication that a federal agency has missed something.  But here, it goes too far to conclude that annual use indicators and greenline ecological status do not comport with reality simply because the RMOs are not met. INFISH recognizes that not all streams will be able to meet all RMOs.  Failure to meet one or more RMOs is not necessarily failure of the overall goal of habitat improvement.

The first category of evidence cited by Western Watersheds consists of various studies finding that, generally speaking, cattle can degrade stream banks. This observation, while obviously true, is unhelpful because the general proposition that cattle can trample stream beds and degrade fish habitat does not necessarily establish that cattle grazing was actually the cause of any RMO shortcomings found on streams in the Copper Basin allotments. Evidence of such general nature is significant because the impacts of grazing in riparian areas and stream beds have the potential to degrade fish habitat (and, as would follow, result in such habitat degradation in some instances). If the potential for fish habitat degradation compelled the curtailment or discontinuation of grazing, then grazing would be disallowed everywhere. However, the legal and regulatory scheme under which the Forest Service operates does not allow for such decisions. In particular, the Multiple-Use Sustained-Yield Act requires that the Forest Service manage forest lands so as to provide for a wide variety of activities on forest lands. The Forest Service cannot elevate one usage – be it conservation, recreation, or resource extraction – above all other uses. 16 U.S.C. §§ 528–53.

The second category is evidence of violations of permit conditions on Copper Basin allotments. In its briefing and statement of facts, WWP contends that there have been rampant and flagrant violations of permit conditions and end-of-season indicators (i.e., the stubble height and woody browse standards) on each of the four allotments. However, that framing of the conditions on the allotments is not supported by the yearly End of Season Reports and the AOIs themselves. The End of Season records indicate that

**MEMORANDUM DECISION AND ORDER - 35**

even if permittees did not always achieve perfect compliance with the terms of their respective grazing permits, they mostly met their annual use indicators for stubble height and woody browse cover.[12]

The Court agrees with Western Watersheds that instances of noncompliance are relevant to whether the Forest Service acted improperly in keeping the grazing leases intact, but the Court is not persuaded that the instances of noncompliance contained in such an extensive administrative record are representative of a pervasive, chronic history of non-compliance.[13]

The third category of information cited by Plaintiffs is the RMO data itself, which the Forest Service began gathering in the late 1990s under the auspices of the PIBO program. This data shows that the vast majority of the streams in the Copper Basin do not

---

[12] The End of Season Reports are contained in the record at AR 17, 29, 53, 66, 92, 117, 133, 177, 213, 237, and 254 (Antelope Allotment); AR 1010, 1015, 1067, 1073, 1144, 1202, 1221, 1271, 1300, and 1320 (Boone Creek Allotment) AR 1991, 2076, 2082, 2094, 2104, 2126, 2135, 2198, 2215, and 2292 (Copper Basin Allotment) and AR 5621, 5627, 5676, 5685, 5734, 5743, 5751, 5783, and 5823 (Wildhorse Allotment).

[13] Western Watersheds also emphasizes that cattle were sometimes found in areas within the four allotments where grazing was not specifically allowed. The fact of cattle trespass in areas where they were not allowed, or where they remained in areas beyond the agreed-upon move date, is obviously not a desirable state of affairs. However, Plaintiffs have not pointed to any evidence suggesting that these trespasses were causally connected to any of the occasional violations of annual use indicators (let alone the RMOs). Further, the Court is mindful that the Forest Service deals with issues such as grazing beyond the four corners of a particular grazing permit in the ongoing day-to-day management of the allotments in the forest. Such an assessment by the Court does not, of course, condone such actions by those who hold the grazing allotments, and the fact of any such missteps, whether from intent and inattentiveness, is an appropriate matter for the Forest Service to consider going forward.

**MEMORANDUM DECISION AND ORDER - 36**

meet and have never met most of the INFISH RMOs, a fact acknowledged by the Forest Service and Intervenors. However, such data alone does not establish that the Forest Service acted arbitrarily and capriciously by allowing grazing to continue, because – to repeat – the RMOs were never intended to be absolute requirements that each and every stream had to meet. As explained above, the important question was not simply whether the streams were meeting each and every RMO, but whether grazing was retarding progress towards the attainment of the RMOs. As explained above, the Forest Service's methodology for deciding this issue – i.e., its protocol of relying on annual use indicators, bank stability, and greenline ecological status to measure the effects of grazing – is a matter of scientific judgment entitled to deference from this Court.

Nonetheless, the PIBO study, which compared RMO data on streams in the Copper Basin to RMO data for streams on both grazed and ungrazed areas in similar ecosystems, indicates there is further room for improvement in the Copper Basin streams. (AR 12675.) However, the PIBO study was not completed until August of 2015, well after the Forest Service had issued AOIs for that year. While the PIBO study may signal an obligation, going forward, to reassess the nature of and the fact of grazing on the Copper Basin allotments, it does not provide a basis for declaring unlawful the 2015 grazing decisions, which are the decisions challenged in this lawsuit. Further, the PIBO study did not identify any statistically significant trends in the RMO data, either positive or negative, on the streams in the Copper Basin. (AR 12694.) In that context, it is certainly sensible (and a matter entitled to deference) that the Forest Service did not draw

conclusions about trends, let alone what was causing those trends, from the raw RMO data.

The fourth and final piece of information relied upon by Western Watersheds is a study titled "Assessment of Selected PIBO DMAs in Wildhorse, Boone Creek, and Copper Basin Allotments." (AR 11674.) Western Watersheds commissioned this study in November of 2014 and sent it to the Forest Service along with a letter requesting that it reconsider grazing conditions on the Copper Basin allotments. The Forest Service did not consider this study when it issued the 2015 AOIs; however, its failure to do so is not an ipso facto evidence that it acted in an arbitrary and capricious manner, or evidence that it failed to consider an important aspect of the problem before it. The study contains deficiencies that are readily apparent, even to a non-scientist. One such deficiency is that the study was conducted on a day when, as the authors themselves noted, "an early season winter storm had brought cold weather and snowfall to the Copper Basin immediately prior and during field data collection. For this reason, limited indicators were measured and all the results must be viewed from this context." (AR 11677–78.) In other words, the weather interfered with collection of data. Elsewhere, the authors identify that "the sample size was relatively small." Scientific reliability is undercut by small sample sizes and faulty data sets, and by extension the usefulness and persuasive impact of the study is similarly undone. Further, it appears that while the study addressed five designated monitoring sites within the Copper Basin allotments, only one – the Summit Creek site – was identified as an area potentially in need of rest from grazing.

Such evidence is not sufficient to establish that the Forest Service acted arbitrarily and capriciously, or that it failed to consider a fundamental aspect of the problem before it. While it would have been useful in this litigation hindsight review if the Forest Service has specifically addressed the study one way or the other, not having done so here given the study's own limitations does not rise to an arbitrary or capricious failure.

In short, aside from the PIBO study results (which were not available to the Forest Service when it issued the AOIS in the spring of 2015), nothing in the record suggests that the Forest Service may have acted arbitrarily and capriciously, or that it failed to consider a crucial aspect of the problem, when grazing was reauthorized in spring 2015 on the same or similar terms as in previous years.

4.      **The Forest Service Was Not Required to Perform a Separate "Consistency Analysis" in the 2015 AOIs.**

Throughout its briefing and at the hearing on the various summary judgment motions, Western Watersheds has argued that the Forest Service's 2015 AOIs must be declared void because the Forest Service never engaged in an explicit "consistency analysis" addressing whether continued grazing was consistent with the Forest Plan, and in particular GM-1 and the RMOs. Western Watersheds relies upon the well-established principle that an agency's decision must stand or fall on the reasoning that is articulated in that decision or contained in the administrative record. (Reply Brief p. 15, Dkt. 49.) Western Watersheds also cites a number of cases that stand for the related idea that courts "cannot defer to a void." *See, e.g.*, *Oregon Nat. Desert Ass'n v. Tidwell,* 716 F. Supp. 2d

982, 1008 (D. Oregon 2010). Extrapolating from these general principles, Western

Watersheds argues that the 2015 AOIs must be declared void because they did not include

an explicit analysis of why the Copper Basin streams were failing to meet the RMOs.

The Court is not persuaded. Yes, any decision the Forest Service makes must be

"consistent with" the applicable Forest Plan, which here includes INFISH. However, the

requirement that decisions be "consistent with" a Forest Plan, generally speaking, does

not impose an obligation to engage in an elaborate "consistency analysis" in the context

of routine decisions such as AOIs. Western Watersheds draws upon 36 C.F.R. §

219.15(d), which prescribes that "a project or activity approval document must describe

how the project or activity is consistent with the applicable [forest] plan components."

However, agency decision making varies in scope and formality, and decisions about

grazing happen in several stages, beginning with the issuance of a term grazing permit.

AOIs are considered "final agency action" subject to APA review, *ONDA*, 465 F.3d at

983, but they are not extensive documents. The relative brevity of an AOI is sensible, in

that the AOIs primarily serve as the implementation instrument of the Forest Service's

long-term directives applicable to a term grazing permit and an allotment management

plan. *Id.* at 980. AOIs also provide a place for the Forest Service to make year-to-year

grazing adjustments that may be called for by changing conditions such as severe

drought, changes in water quality, the degree of risk to threatened or endangered species,

or the success or failure of habitat restoration projects. *Id.*

**MEMORANDUM DECISION AND ORDER - 40**

In contrast, broader considerations such as whether grazing is generally consistent with the Forest Plan would be addressed in the permit itself, or in an allotment management plan. *Id.* Thus, while the Forest Service clearly has an obligation to adjust grazing practices based on the success or failure of habitat restoration projects such as INFISH, there is no practical reason to do so unless information is available as to whether a particular project has succeeded or failed. The Forest Service need not anticipate questions unnecessary to its analysis, nor respond to uncertainties that are "not reasonably supported by any scientific authority." *Lands Council v. McNair,* 537 F.3d 981, 1002 (9th Cir. 2008) (overruled on other grounds by *American Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). For these reasons, the Court does not interpret either 36 C.F.R. § 219.15(d), *ONDA*, or NFMA to require an agency already overburdened with work to perform a "consistency analysis" in each and every AOI, where nothing otherwise indicates that such an exercise would be worthwhile.

For all these reasons, Western Watersheds has failed to carry its burden of proving that the Forest Service acted in an arbitrary and capricious manner in allowing grazing to continue as it had in prior years when it issued the 2015 AOIs. The PIBO study does identify some differences between RMO data on streams in the Copper Basin and streams in other ecologically similar environments, both grazed and un-grazed. That these differences exist suggests that further improvement can be obtained in the condition of the Copper Basin streams, and it is therefore an open question as to what changes, if any, in the grazing permit terms are appropriate for the Forest Service to address going

forward.  However, the PIBO study report had not been completed when the 2015

decisions were made, and the questions of whether or not the Forest Service adjusted its

practices in 2016 and 2017 in response to the PIBO study are not before the Court.

**5.      Sediment Standard 5(f) Does Not Provide a Basis for Invalidating Grazing
         Decisions.**

        Finally, the Court addresses Western Watershed's contention that the Forest

Service violated certain sediment standards contained with the Challis Forest Plan when it

issued the 2015 AOIs.  The Forest Plan contains a series of standards and guidelines to

protect soil, water, and air.  (AR 9207–08.)  The issue raised by Western Watersheds

implicates Standard 5(f), which provides:

> Impacts of activities may not increase fine sediment by depth (within
> critical reaches) of perennial streams by more than 2 percent over existing
> levels. Where existing levels are at 30% or above the new activities that
> would create additional stream sedimentation would not be allowed. If these
> levels are reached or exceeded, activities that are contributing sediment will
> be evaluated and appropriate action will be taken to bring fine sediment
> within threshold levels.

(AR 9208.)  Western Watersheds contends that in recent years, sediment levels in several

streams in the Copper Basin allotments have exceeded 30 percent.  Western Watershed

argues that the Forest Service failed to evaluate these sediment levels when issuing the

2015 AOIs and failed to take any action to reduce sediment levels in those streams.

Therefore, according to Western Watersheds, the Forest Service decision to re-authorize

grazing in the 2015 AOIs was inconsistent with the Forest Plan.

**MEMORANDUM DECISION AND ORDER - 42**

Significant in the Court's analysis of this argument is that Sediment Standard 5(f) directs the Forest Service to curtail activities only if those activities are "contributing sediment." There seems to be no argument over the fact that, because of the possibility for bank erosion and an impact upon natural vegetation, cattle grazing can increase fine sediment levels in a stream. But, the Forest Service points to extensive evidence in the record demonstrating that it is difficult to accurately measure sediment levels in streams, and that such measurements must be made over a long period of time, in different locations, before conclusions can be drawn about overall trends and causation issues. (*See, e.g.*, AR 045305–309, 45786, 45777, 45814.)

In fact, the Forest Service monitors sediment levels in various streams throughout the Copper Basin. The data it obtains is recorded in End of Season Reports and the AOIs. The yearly measurements are also aggregated over time, presumably to scrutinize such data for any identifiable long term trends. (AR 541, 637, 1466, 1514, 2549, 2597, 6178, 6300, 32717, 32746, 45598, 45752, 45788, 45812, 46038, 46067, and 17826 (aggregate data).)[14] The Forest Service acknowledges that livestock can contribute to sediment levels, but points out that roads, trails, recreation, mining, vegetation removal, development, and natural events such as wildfire also contribute to sediment levels. (AR 45775–787.)

---

[14] The aggregate data shows that sediment levels in various Copper Basin streams went up and down over the ten-year period from 2003 to 2013. (AR 17826. )

Extensive scientific literature in the record indicates that managing the impacts of livestock on vegetation near streams helps to minimize the effect of sediment tied directly to livestock grazing. (*See* Forest Service Brief p. 11, Dkt. 94, and references therein.) But, according to the Forest Service, roads are the biggest source of stream sediments and therefore, most of its efforts to reduce sediment are focused on maintaining roads and trails. *Id.* at 9. These assertions all find ready support in the record.

This Court has previously recognized that sediment levels in streams can "come from various sources, and that the measurement of those levels does not necessarily reveal grazing's contribution." *Western Watershed Project v. U.S. Forest Serv.,* 780 F. Supp. 2d at 1115, 1121 (D. Idaho 2011). Here too, issues such as the cause of sediment levels, the long-term significance of sediment level trends from year to year, and questions of how best to minimize the levels of sediment in streams are best left to the expertise, when properly employed, of the Forest Service. *Id.* On this record and argument, Western Watersheds has not met its burden of demonstrating that the challenged Forest Service's decisions were arbitrary and capricious. *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–33 (9th Cir. 1986).

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

**MEMORANDUM DECISION AND ORDER - 44**

**ORDER**

1.     For all the above reasons, Plaintiff's Motion for Summary Judgment (Dkt. 34) is **DENIED.**

2.     Defendant's and Intervenors' Cross-Motions for Summary Judgment (Dkts. 44 and 46) are **GRANTED.**  A judgment dismissing the case will follow.

3.     The Clerk of the Court is directed to note that the Court has revised its earlier Order (Dkt. 81) on Plaintiff's Motion to Strike (Dkt. 50).  Hence, based upon the Court's decision above, the docket should reflect that this motion is **DENIED.**

**IT IS SO ORDERED.**

DATED:  **October 31, 2017**.

Honorable Ronald E. Bush
U. S. Magistrate Judge